## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

**CAROL A. KALINOSKI,**

    **Plaintiff,**

    **v.**

**CARLOS M. GUTIERREZ,**
**SECRETARY OF COMMERCE,**[1]

    **Defendant.**

</td><td>

**Civil Action No.  04-1206 (JDB)**

</td></tr>
</table>

## MEMORANDUM OPINION

Defendant's motion for summary judgment in this employment-discrimination action requires the Court to determine whether there is sufficient evidence from which a reasonable jury could conclude, first, that plaintiff -- a former employee of the United States Department of Commerce -- suffered objectively tangible harm as a result of either of two challenged personnel actions and, second, that one or both of those personnel actions was done, at least in part, because of plaintiff's sex or because she had engaged in protected activity by filing a sex-discrimination claim.  The motion also seeks partial summary judgment on plaintiff's claim that she was forced to resign because of the combined effect of the personnel actions and defendant's contemporaneous decisions to reject plaintiff's requests for paid medical leave and place her on

---

[1] The Court has substituted the current Secretary of Commerce as the defendant in place of his predecessor.  See Fed. R. Civ. P. 25(d)(1) ("When a public officer is a party to an action in his official capacity and during its pendency ... ceases to hold office, ... the officer's successor is automatically substituted as a party."); see also 42 U.S.C. § 2000e-16(c) (stating that, in an employment-discrimination case brought against a federal government employer, "the head of the department ... shall be the defendant").

leave without pay.  Having carefully reviewed the entire record, the Court concludes, for the

reasons that follow, that plaintiff has come forward with sufficient evidence to allow this case to

proceed on her claims of sex discrimination and retaliation, but that defendant is entitled to

partial summary judgment on the issue of constructive discharge.

## BACKGROUND[2]

Until the events that gave rise to this action, plaintiff Carol Kalinoski had served for

nearly eight years as the Chairman of the Operating Committee on Export Policy ("Operating

Committee") of the Bureau of Industry and Security ("BIS") of the United States Department of

Commerce.  In that position, she oversaw the activities of the Operating Committee, an

interagency body created by executive order to resolve disputes between and among the

Departments of Commerce, Energy, Defense, State, and Justice regarding licenses for the export

of goods, technology, and data that have both civilian and military uses.

The Chairman of the Operating Committee holds a senior, supervisory position within the

Office of the Assistant Secretary of Commerce for Export Administration.  In 2003, when the

relevant events occurred, plaintiff's immediate superior was Matthew Borman, the Deputy

Assistant Secretary for Export Administration, her second-line supervisor was James Jochum, the

Assistant Secretary for Export Administration, and her third-line supervisor was Kenneth Juster,

the Undersecretary for Industry and Security, which is the highest position within the BIS.

As Operating Committee Chairman, plaintiff had significant contact with presidentially

appointed policy-makers across the government and served as a principal adviser to senior

---

[2] Unless otherwise noted, this summary of the factual background is based on the affidavit submitted by plaintiff with her memorandum in opposition to defendant's motion for summary judgment.  Factual statements derived from other evidence are undisputed.

Commerce Department officials on issues related to the licensing of so-called "dual use" materials and technology.  Plaintiff represented the Department of Commerce in fact-finding missions overseas and in conferences with officials of foreign governments.  She also served as the executive secretary of the Advisory Committee on Export Policy and the Export Administration Review Board, which have authority to review Operating Committee decisions.

Plaintiff, a lawyer, first began working at the Department of Commerce in 1990.  She was elevated to Acting Chairman of the Operating Committee in 1995 and was competitively appointed to that position on a permanent basis in 1998.  Shortly thereafter, she was promoted to the GS-15 salary level.  During plaintiff's tenure as Chairman, her supervisors regularly rated her performance as "outstanding," and, in recognition of her performance, she received several cash awards.  On March 23, 2003, with the approval of defendant, plaintiff commenced a four-month unpaid educational leave to complete her thesis for a Master of Laws degree.  In her absence, defendant appointed David Flynn, who then held a position at the GS-14 level, to serve as Acting Chairman of the Operating Committee.

On July 21, 2003, two days before the anticipated end of her educational leave, plaintiff met Mr. Borman for lunch, at which time he advised her that she would not return as Chairman of the Operating Committee and that she would be reassigned to a newly created position within the Office of Exporter Services, under the supervision of the office director, Eileen Albanese. The new position, Export Policy Analyst, was to have a pay grade of GS-15, like that of the Operating Committee Chairman, but would involve different responsibilities.  Plaintiff immediately expressed to Mr. Borman her objection to the reassignment.  Following the meeting, defendant formally reassigned plaintiff from the position of Operating Committee Chairman to

the position of Export Policy Analyst.

On July 29, plaintiff sent an e-mail to Mr. Borman, with copies to Mr. Jochum and Mr. Juster, requesting that he reconsider the reassignment or, in the alternative, "attempt to identify another reassignment in the federal civil service which is comparable to [plaintiff's] former position and is career enhancing." Def.'s Ex. 19. Mr. Borman's reply, sent the same day, indicated that he would not reconsider plaintiff's removal as Operating Committee Chairman but that he was "open to hearing about" plaintiff's counterproposal. Def.'s Ex. 20.

Plaintiff alleges that, as a result of defendant's actions in reassigning her, she immediately began to suffer from depression and extreme anxiety. On July 30, plaintiff requested that defendant permit her to use accrued medical leave through August 1. Def.'s Ex. 37. Mr. Borman approved that request and subsequently approved requests by plaintiff to use medical leave through August 15. Id. On August 20, Ms. Albanese (who was plaintiff's supervisor of record) sent a letter to plaintiff stating that plaintiff's request for medical leave from August 16 through August 22 would not be approved without more detailed medical documentation. Id. Eventually that leave was approved, as were subsequent requests for paid medical leave through October 4.[3] Effective October 5, 2003, defendant designated plaintiff as absent without leave. Defendant acknowledges that "Plaintiff had a positive sick leave balance at the time she was placed in leave without pay status." Answer ¶ 42.

During the period that plaintiff was on medical leave, defendant issued a vacancy

---

[3] The parties previously had quarreled over the precise date on which defendant was placed on leave without pay. Since the motions hearing, however, the parties have agreed that plaintiff was not paid after October 4, 2003, and have submitted evidence supporting that fact. See Def.'s Suppl. Mem. at 1 n.1; Pl.'s Suppl. Mem. at 1.

announcement for the position of Operating Committee Chairman.  Plaintiff timely applied for

the position.  Under the competitive evaluation criteria established by Mr. Borman for the

vacancy, plaintiff received the highest rating of any applicant for the position (a perfect 100%)

and interviewed with Mr. Borman for the position.  Plaintiff contends that, during that interview,

Mr. Borman attempted to discuss the status of a proposal by plaintiff that, in lieu of the

reassignment as Export Policy Analyst, defendant put her on a detail to the Office of the

Undersecretary of Defense.

On or about October 31, 2003, plaintiff learned that defendant had chosen Mr. Flynn for

the position of Operating Committee Chairman.  That same day, Ms. Albanese sent plaintiff a

letter that rejected a request for medical leave for the period of October 20 through October 31,

citing the recommendation of the Commerce Department's Medical Officer, Dr. Reginald Wills.

Def.'s Ex. 39.  By letter dated November 7, 2003, plaintiff resigned from the Department of

Commerce.  Her letter to Secretary Donald Evans stated that she felt "compelled to resign"

because she believed "BIS management ha[d] forced me out of the federal civil service, for

discriminatory reasons, without retirement benefits."  Def.'s Ex. 48.

Plaintiff initiated informal contact with the Commerce Department's Office of Civil

Rights regarding her involuntary reassignment on August 8, 2003.  On October 1, she filed a

formal administrative complaint asserting sex discrimination and stated in her complaint that she

would consider denial of her application for the position of Operating Committee Chairman to be

discriminatory or retaliatory.  Def.'s Ex. 46.  By letter dated February 11, 2004, plaintiff

requested that the Office of Civil Rights further investigate her assertion that she was

constructively discharged.  Pl.'s Ex. 13.  Nancy McNamara, the chief of the compliance division

of the Office of Civil Rights, accepted the request as an amendment to plaintiff's administrative

complaint on February 19, 2004.  Pl.'s Ex. 14.  The investigator assigned to plaintiff's complaint

issued a report of his factual findings on March 24, 2004.  Pl.'s Ex. 15.  Four months later, on

July 16, 2004, plaintiff filed this civil action.  At that time, the Department of Commerce had not

taken any final action with regard to plaintiff's administrative complaint.

## STANDARDS OF REVIEW

Title VII of the Civil Rights Act of 1964, as amended, forbids federal agencies from

making employment decisions on the basis of sex.  See 42 U.S.C. § 2000e-16.  It further

prohibits agencies from retaliating against employees for the assertion of their rights under Title

VII.  See 42 U.S.C. § 2000e-3(a) (prohibiting discrimination against an employee because the

employee "has made a charge, testified, assisted, or participated in any manner in an

investigation, proceeding, or hearing under [Title VII]"); Rochon v. Gonzales, 438 F.3d 1211,

1216 (D.C. Cir. 2006) (concluding that section 2000e-3(a) applies to federal employment actions

through the language of 42 U.S.C. § 2000e-16).  Where, as in this case, there is no *direct*

evidence of unlawful discrimination, courts apply the burden-shifting framework established by

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and its progeny.

Pursuant to McDonnell Douglas, the plaintiff, as an initial matter, has the burden of

establishing a *prima facie* case of discrimination by a preponderance of the evidence.  Id. at 802;

Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).  To establish a *prima facie*

case of unlawful discrimination under Title VII, a plaintiff must demonstrate (1) that she is a

member of a protected class; (2) that she suffered an adverse employment action (that is, an

action that results in "objectively tangible harm," Brown v. Brody, 199 F.3d 446, 457 (D.C. Cir.

1999)); and (3) that the unfavorable action occurred under circumstances that give rise to an inference of discrimination.  Stella v. Mineta, 284 F.3d 135, 145 (D.C. Cir. 2002); Brody, 199 F.3d at 452.  To establish a *prima facie* case of unlawful retaliation under Title VII, a plaintiff must show (1) that she engaged in a protected activity, (2) that she subsequently was subjected to an adverse action by her employer, and (3) that there was a causal connection between the two events.  Mitchell v. Baldridge, 759 F.2d 80, 86 (D.C. Cir. 1985); Childers v. Slater, 44 F. Supp. 2d 8, 18-19 (D.D.C. 1999).  The fact that plaintiff engaged in protected activity is not in dispute here.  A *prima facie* case creates a rebuttable presumption of discrimination or retaliation.

Once a Title VII plaintiff establishes a *prima facie* case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.  McDonnell Douglas, 411 U.S. at 802.  The employer's burden, however, is merely one of production.  The employer "need not persuade the court that it was actually motivated by the proffered reasons.  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff."  Burdine, 450 U.S. at 254-55.  Doing so removes any presumption of discrimination or retaliation created by the *prima facie* case.

If the defendant employer has produced sufficient evidence of a nondiscriminatory justification for its actions (and, notwithstanding plaintiff's assertion to the contrary at the motions hearing, it does not take much evidence to do so), the burden of production shifts back to the plaintiff to show that the employer's stated reason was a pretext for discrimination or retaliation.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000).  "[T]he sole remaining issue [is] discrimination *vel non*.  At this point, to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the

adverse employment decision was made for a discriminatory reason." Lathram v. Snow, 336
F.3d 1085, 1088 (D.C. Cir. 2003).

As with all motions for summary judgment, the Court must assume the truth of the
non-moving party's factual statements (at least as to facts other than the ultimate issue) and the
Court must draw all evidentiary inferences in favor of the non-movant. See Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 255 (1986). The Court, however, need not accept as true "conclusory
allegations lacking any factual basis in the record." See Hussain v. Nicholson, 435 F.3d 359, 365
(D.C. Cir. 2006). But the party opposing summary judgment (here, the plaintiff) must establish
more than the "mere existence of a scintilla of evidence" in support of its position. Anderson,
477 U.S. at 252. Indeed, the movant may succeed on summary judgment by pointing to the
absence of evidence proffered by the non-moving party. "If the [non-movant's] evidence is
merely colorable, or is not significantly probative, summary judgment may be granted." Id. at
249-50. In short, summary judgment is appropriate if the non-movant fails to offer "evidence on
which the jury could reasonably find for the [non-movant]." Id. at 252.

Here, then, plaintiff, as the non-moving party, must offer evidence from which a jury
could reasonably conclude that she was the victim of intentional discrimination or retaliation.
One way in which she can do that is by producing evidence that tends to show that "the
employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256. But
"[p]roof that the defendant's explanation is unworthy of credence is simply one form of
circumstantial evidence that is probative of intentional discrimination." Reeves, 530 U.S. at 147.
Thus, the trier of fact also may "consider the evidence establishing the plaintiff's *prima facie* case
'and inferences properly drawn therefrom ... on the issue of whether the defendant's explanation

-8-

is pretextual.'" Id. (quoting Burdine, 450 U.S. at 255 n.10).

"Whether judgment as a matter of law is appropriate in any particular case will depend on

a number of factors ... includ[ing] the strength of the plaintiff's *prima facie* case, the probative

value of the proof that the employer's explanation is false, and any other evidence that supports

the employer's case and that properly may be considered on a motion for judgment as a matter of

law." Reeves, 530 U.S. at 148-49.  As the D.C. Circuit has explained:

> Assuming then that the employer has met its burden of producing a
> nondiscriminatory reason for its actions, the focus of proceedings at trial (and at
> summary judgment) will be on whether the jury could infer discrimination from
> the combination of (1) the plaintiff's *prima facie* case; (2) any evidence the
> plaintiff presents to attack the employer's proffered explanation for its actions; and
> (3) any further evidence of discrimination that may be available to the plaintiff
> (such as independent evidence of discriminatory statements or attitudes on the part
> of the employer) or any contrary evidence that may be available to the employer
> (such as evidence of a strong track record in equal opportunity employment).

Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1289 (D.C. Cir. 1998) (*en banc*); see also

Waterhouse v. Dist. of Columbia, 298 F.3d 989, 992-93 (D.C. Cir. 2002).

Plaintiff in this case alleges two distinct -- though closely intertwined -- adverse

employment actions: (1) involuntary reassignment to a new position and (2) non-selection for the

position she previously held.  Plaintiff further alleges two unlawful motives for those actions: (1)

sex discrimination, as to the first and second actions, and (2) retaliation for protected activity, as

to the second action only.  Ultimately, the question for the Court in resolving defendant's

summary judgment motion is whether a reasonable jury could conclude that any of the

Commerce Department's proffered explanations for these actions are pretextual and thereby infer

unlawful discrimination or retaliation.  The motion for summary judgment also asserts that

plaintiff may not claim that the allegedly unlawful personnel actions, along with the subsequent

denial of plaintiff's request to use accrued medical leave, amounted to a constructive discharge.

## ANALYSIS

### I.      Title VII Claims

#### A.      Involuntary Reassignment (Sex Discrimination)

With respect to plaintiff's initial reassignment, defendant argues that it is entitled to summary judgment for two principal reasons: first, that no reasonable jury could conclude that plaintiff suffered an adverse employment action when she was reassigned from the position of Operating Committee Chairman to the position of Export Policy Analyst, and, second, that there is insufficient evidence from which a jury could reasonably conclude that plaintiff's sex was a reason for the reassignment.

#### 1.      Plaintiff's reassignment may be an actionable adverse action

In <u>Brody</u>, the D.C. Circuit said that "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, *reassignment with significantly different responsibilities*, or a decision causing a significant change in benefits."  199 F.3d at 456 (emphasis supplied).  The court of appeals went on to say that "[a] plaintiff who is made to undertake ... a lateral transfer" -- that is, a reassignment in which she suffers no diminution in pay or benefits -- *can* maintain a cause of action under Title VII if she has endured "materially adverse consequences affecting the terms, conditions, or privileges of her employment or her future employment opportunities such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm."  <u>Id.</u> at 457.  In <u>Stewart v. Ashcroft</u>, 352 F.3d 422, 427 (D.C. Cir. 2003), the D.C. Circuit reiterated the principle it had articulated in <u>Brody</u>: "[W]hile generally lateral transfers, or the denial of them, [will] not be

considered adverse employment actions, there are circumstances where they [may] be."  And in the very recent case of <u>Holcomb v. Powell</u>, the court found such circumstances, holding that a Title VII plaintiff had suffered "materially adverse consequences that inflict[ed] objectively tangible harm" when, following an ostensibly "lateral" reassignment, she spent two years doing work that was commensurate with a GS-5 position while continuing to be classified and paid at the GS-11 level.  433 F.3d 889, 902-03 (D.C. Cir. 2006).

Here, defendant contends that plaintiff did not suffer any actionable adverse employment consequences as a result of her reassignment from Operating Committee Chairman to Export Policy Analyst.  Defendant emphasizes that plaintiff incurred no loss of grade, salary, or benefits, even though her precise job responsibilities changed to some degree.  Defendant further suggests that the two positions are largely analogous, pointing to the fact that the Export Policy Analyst post would involve serving as an interagency liaison (with the Central Intelligence Agency) and also serving as the head of a committee (the "Operating Committee is Informed," or OCI).  Defendant also argues -- correctly -- that damage to reputation alone is not enough to create an adverse employment action.  Plaintiff, however, counters that the reassignment constituted an adverse employment action for three principal reasons: (1) she was stripped of her supervisory duties, (2) she suffered a loss of advancement potential, and (3) she was effectively moved down within the agency hierarchy because she no longer reported directly to a presidentially appointed and Senate-confirmed official.

The latter two points have less probative force than the first on the issue of adversity -- but, when combined with the first point, they do lend some credence to the argument that plaintiff suffered materially adverse consequences as a result of the reassignment.  With respect

to plaintiff's harm-to-advancement-potential argument, even plaintiff seems to recognize that she cannot demonstrate that she actually lost advancement or promotion potential as a result of the reassignment. Indeed, she does not contest the point in her opposition. At its core, this argument is simply another way of saying that her reputation in the field was diminished because she was relegated to a lower-profile job. Although this point is not entirely immaterial to plaintiff's claim, the proof offered in support is speculative.

As for plaintiff's change-in-reporting argument, it is undeniable that one's influence and authority within the heirarchy of a government agency may be affected by the identity of one's immediate supervisor. Thus, there may be circumstances where the identity of one's supervisor is relevant to determining whether a change in job description constitutes an objectively tangible harm. Defendant contends that, whether plaintiff reported to a presidentially appointed official (a deputy assistant secretary) or to a high-ranking civil servant (an office director) makes no difference, because both Deputy Assistant Secretary Borman, plaintiff's prior supervisor, and Ms. Albanese, plaintiff's would-be supervisor in the Export Policy Analyst position, were members of the Senior Executive Service. This may be a bit oversimplified. No one who is familiar with Washington bureaucracy and executive-branch politics can credibly assert that all SES officials are created equal. Indeed, the D.C. Circuit specifically rejected a similar theory advanced by the government in Stewart. See 352 F.3d at 427. Thus, plaintiff's testimony that Albanese held a position that was at a "lower level" or more "junior" to that of Borman, see Kalinoski Decl. at 6-7, if believed by a jury, might support a reasonable conclusion that the reassignment constituted an objectively tangible harm to plaintiff, notwithstanding that plaintiff retained her pay grade, salary, and benefits. In a similar vein, the fact that the Operating Committee Chairman (unlike

the post of Export Policy Analyst) was created by a presidential order might in fact be reflective

of a meaningful distinction between the two positions despite their comparability in pay grade.

Standing alone, however, such changes in reporting would not constitute an adverse employment

action, and hence it is to the alleged loss of supervisory duties that the Court now turns.

Defendant seems to concede -- wisely -- that the total, permanent stripping of supervisory

duties *would* be an actionable adverse action.  But, according to defendant, that is not what

happened here.  Defendant asserts that there had been some thought among Commerce

Department higher-ups that this new position might someday have subordinates.  Because

plaintiff did not assume the new position, defendant argues, she cannot prove that the position

would always have lacked supervisory responsibility and therefore she cannot establish that the

initial loss of supervisory duties (which defendant acknowledges) would have become

permanent.  Defendant's contention that there was a possibility of future supervisory

responsibilities for the Export Policy Analyst position, however, is belied by the fact that the

position (to the extent it continues to exist at all) has not evolved into a leadership post and also

by the testimony of Commerce Department officials that it was highly unlikely that this position,

as it was conceived, would ever have come to involve supervising others.  See Borman Dep. at

72-73; Jochum Dep. at 54; Albanese Dep. at 19.  Furthermore, the Court agrees with plaintiff that

Title VII does not require employees to take a wait-and-see approach in a situation where an

employer removes supervisory responsibilities but does so without explicitly stating that the

removal is permanent.  Because Title VII's time limits are tied to discrete events, any such wait-

and-see rule would, as a practical matter, prevent employees from bringing Title VII actions

based on the loss of supervisory responsibilities because the employer could always claim that it

might someday restore those responsibilities.

Defendant relies heavily on the Seventh Circuit's decision in <u>Place v. Abbott Labs.</u>, 215 F.3d 803 (7th Cir. 2000), which involved a plaintiff whose principal complaint was "that she was moved from an interesting job that she liked that involved overseeing several other people to a boring job she didn't like that lacked any supervisory duties," <u>id.</u> at 810. The court, in a decision reversing a jury verdict for the plaintiff, said that "being shifted to an essentially equivalent job that [plaintiff] did not happen to like as much does not a Title VII claim create." <u>Id.</u> at 810. That truism, however, is not dispositive here because a central dispute between the parties is whether the position of Operating Committee Chairman and the position of Export Policy Analyst were, in fact, "essentially equivalent." The facts in <u>Place</u> allowed the court to conclude that the positions were "essentially equivalent," as a matter of law, much more readily than the facts here do. Indeed, the court in <u>Place</u> discussed in some detail the project-based nature of the pharmaceutical research-and-development business and the fact that one inevitable consequence of plaintiff's project-oriented job was that employees' responsibilities would shift from time to time and, occasionally, be diminished. Here, there is no similar argument that such shifting responsibilities were an ordinary fact of life for someone in plaintiff's position.

On balance, plaintiff has the better of this argument. Keeping in mind that the *prima facie* burden should not be onerous and that all reasonable factual inferences must be drawn in favor of the non-moving party, the Court concludes that there is a genuine dispute of material fact as to whether plaintiff suffered an adverse employment action. Although a jury may ultimately conclude that the positions were not meaningfully different, the evidence now before the Court fails to support a finding as a matter of law that the reassignment did not entail

objectively tangible harm.  Thus, defendant cannot prevail on its motion for summary judgment on this ground.

### 2. The evidence may support a reasonable inference of discrimination

Under the <u>McDonnell Douglas</u> framework, plaintiff has met her *prima facie* burden to come forward with evidence that tends to create a rebuttable inference of discrimination because she was replaced in the position by a man (that is, someone from outside her protected class).[4] Defendant, however, has come forward with evidence of a nondiscriminatory justification for the reassignment -- namely that the creation of the Export Policy Analyst position and the assignment of plaintiff to that position were done to "enhance BIS's ability to carry out its mission," <u>see</u> Def.'s Stmt. of Material Facts Not in Dispute at 13 (quoting Decl. of Mr. Borman), and that "the reassignment was long contemplated, well-researched and necessary to fulfill the mission of the Agency," <u>see</u> Def.'s Mem. in Supp. of Mot. for Summ. J. at 21.

That being the case, the final prong of the <u>McDonnell Douglas</u> framework requires plaintiff to produce circumstantial evidence sufficient for a jury to find that the challenged action was motivated by unlawful discrimination.  This may (and usually does) involve producing evidence that tends to undercut the defendant's proffered explanation for the challenged action -- that is, evidence establishing that the explanation is pretextual.  In <u>Aka</u>, the D.C. Circuit said that, "[a]lthough the plaintiff cannot always avoid summary judgment by showing the employer's explanation to be false ... such a showing does have considerable evidentiary significance."  156

---

[4] Although "a plaintiff in a discrimination case need not demonstrate that she was replaced by a person outside her protected class in order to carry her burden of establishing a *prima facie* case under <u>McDonnell Douglas</u>," <u>Stella</u>, 284 F.3d at 146, where a plaintiff does make such a showing, she normally will satisfy her burden of establishing an inference of discrimination based on class status.

F.3d at 1292.  That is because, the court said,

> when the plaintiff rebuts the employer's own explanation of its challenged acts, this
> eliminates the principal nondiscriminatory explanation for the employer's actions.  Events
> have causes; if the only explanations set forth in the record have been rebutted, the jury is
> permitted to search for others, and may in appropriate circumstances draw an inference of
> discrimination. ...
>
> If the jury can infer that the employer's explanation is not only a mistaken one in terms of
> the facts, but a lie, that should provide even stronger evidence of discrimination.  ... This
> is so because, according to ordinary evidentiary principles[,] ... a lie is evidence of
> consciousness of guilt.  The jury can conclude that an employer who fabricates a false
> explanation has something to hide; that "something" may well be discriminatory intent.

Id. at 1292-93.  In short, the Aka court said, "[i]n an appropriate case, '[t]he factfinder's disbelief

of the reasons put forward by the defendant' will allow it to infer intentional discrimination." Id.

at 1294 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (U.S. 1993)).  More recently,

the D.C. Circuit observed that "[u]sually, proffering 'evidence from which a jury could find that

[the employer's] stated reasons ... were pretextual ... will be enough to get a plaintiff's claim to a

jury.'" George v. Leavitt, 407 F.3d 405, 413 (D.C. Cir. 2005).  "Although a jury may ultimately

decide to credit the version of the events described by [defendant] over that offered by [plaintiff],

this is not a basis upon which a court may rest in granting a motion for summary judgment." Id.

The facts of this case, in the Court's judgment, would not preclude a reasonable jury from

disbelieving defendant's proffered justification in light of the evidence produced by plaintiff that

tends to show that the Export Policy Analyst position was *not* particularly vital to the agency's

mission.  Plaintiff has come forward with testimonial evidence that the Export Policy Analyst

position has never been permanently filled or funded, that many of its described functions (the

OCI functions) are performed in a few hours a week by a GS-13 employee, and that other

functions (the interagency liaison functions) are performed by another employee who is on detail

-16-

at the CIA.  <u>See</u> Pl.'s Opp'n to Mot. for Summ. J. at 13-14.  This stands as sufficient evidence, if believed, to rebut defendant's gender-neutral justification.  Defendant makes no effort to contest this evidence; indeed defendant ignores it entirely in the two short paragraphs of its papers that address this prong of the <u>McDonnell Douglas</u> framework.  <u>See</u> Def.'s Mem. in Supp. of Mot. for Summ. J. at 24.

Plaintiff also has come forward with some evidence of defendant's "shifting rationales" for replacing plaintiff, including the notes of defendant's expert witness, Dr. Carole Giunta, that apparently reflect comments by plaintiff's former supervisors -- made subsequent to the initiation of litigation -- that plaintiff's "relationships with key people were broken," that "all office directors complain[ed] a lot" about her, that she was a "constant source of friction," that she caused "100% turnover in ... staff," and that she "became caught up in the status of the position to the detriment of the office."  <u>See</u> Pl.'s Opp'n to Mot. for Summ. J. at 15-16 (citing Pl.'s Ex. 30). The shifting-rationale evidence also includes the declaration that Mr. Borman provided to the agency's investigator earlier in the case, in which he at least implied that one motivation for replacing plaintiff was that, while she was on authorized education leave, he learned that a number of export license applications had been "languishing" for more than a year and that he was surprised plaintiff had not brought this to his attention, "although she should have done so." <u>See</u> Pl.'s Ex. 5 at 3-4.  By contrast, in his subsequent deposition, Mr. Borman stated that plaintiff's transfer was not based on concerns about her performance.  <u>See</u> Pl.'s Ex. 26 at 51.  This evidence of alternate justifications tends to undercut the proffered explanation -- even though these other reasons, if believed, might not necessarily help plaintiff win her case.

### 3.      Defendant is not entitled to summary judgment

Having concluded that plaintiff's evidence tends to undercut the veracity of defendant's explanation, the question then is whether "a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." Lathram, 336 F.3d at 1088.  Taking into consideration, as the Supreme Court directed in Reeves, 530 U.S. at 148-49, "the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law," the Court concludes that plaintiff has raised genuine issues of material fact that cannot be resolved on summary judgment.  That is not to say that plaintiff's evidence is in any way overwhelming or objectively persuasive.  Indeed, it is worth noting that plaintiff's case of sex discrimination in reassignment is based entirely upon evidence that either tends to negate defendant's explanation or (in some cases) tends to rule out other possible gender-neutral explanations for the reassignment.  Totally absent from the record is any circumstantial evidence tending to affirm that plaintiff's sex was a consideration in the challenged action, such as the sort of "independent evidence of discriminatory statements or attitudes on the part of the employer" that the D.C. Circuit referenced in Aka.  See 156 F.3d at 1289.  The inference of sex-based bias is therefore not a strong one.  But, under the applicable precedent in this Circuit, it is nonetheless a proper issue for jury resolution.

### B.      Non-selection/Denial of Lateral Transfer (Sex Discrimination and Reprisal)

As for the second challenged action -- the non-selection of defendant when she reapplied for her former job -- plaintiff alleges that this decision was the result of both sex discrimination

and unlawful retaliation for her involvement in protected activity.  Although in some ways similar to the reassignment claim, this non-selection claim warrants independent analysis.

1.      **Plaintiff has made out a *prima facie* case**

The Court need not say much about whether the evidence would permit a reasonable jury to conclude that this decision (whether it is called a non-selection or a denial of a lateral transfer) constitutes objectively tangible harm.  If a jury could reasonably conclude that the decision to reassign plaintiff to the Export Policy Analyst post was an adverse employment action -- as the Court has found -- then it certainly could conclude that non-selection for the post of Operating Committee Chairman was, as well.  Indeed, as the D.C. Circuit said in Stewart, "[j]ust as withdrawing an employee's supervisory duties constitutes an adverse employment action, so too failing to select an employee for a position with substantially greater supervisory authority is an adverse employment action."  352 F.3d at 427.  With respect to the final element of plaintiff's *prima facie* case of *sex discrimination*, in this case an inference of discrimination arises because defendant chose someone of a different sex than plaintiff for the position.

The *prima facie* case of *retaliation*, however, presents a closer question.  Defendant vigorously challenges the third prong of the *prima facie* case of unlawful reprisal -- the inference of a causal connection between the protected activity and the non-selection.  Courts have held that "[a] plaintiff may satisfy this third element of a *prima facie* case [of retaliation] by showing 'the employer had knowledge of the employee's protected activity, and ... the adverse personnel action took place shortly after that activity.'"  Holcomb, 433 F.3d at 903.  The parties agree that plaintiff initially contacted the Commerce Department's Office of Civil Rights on August 8, 2003, and that formal selection of the new permanent Operating Committee Chairman was made

nearly three months later, on or about October 31, 2003.  Defendant asserts that this is too large

of a temporal gap to permit any inference of a retaliatory motive.

Title VII, of course, does not say that retaliation must be immediate for it to be

actionable.  But cases interpreting the law do hold that, if the only circumstantial evidence of

retaliation is temporal proximity between the protected activity and the alleged retaliatory action

(as is the case here), then those events must be very close in time for that evidence to be

sufficient for a jury to infer a retaliatory motivation.  Thus, as defendant points out, "[t]he cases

that accept mere temporal proximity between an employer's knowledge of protected activity and

an adverse employment action as sufficient evidence of causality to establish a *prima facie* case

uniformly hold that the temporal proximity must be very close.'"  Clark County School Dist. v.

Breeden, 532 U.S. 268, 273 (2001).  Indeed, judges of this court have held that the passage of

two months may create too wide a temporal chasm to give rise to an inference of causal

connection.  See Baker v. Potter, 294 F. Supp. 2d 33, 41 (D.D.C. 2003).  But it also is true that

there is no hard-and-fast rule that two or three months is too removed for an inference of

causation.  Moreover, as the D.C. Circuit emphasized in Holcomb, "[a]t the *prima facie* stage of

a retaliation claim, a plaintiff's burden 'is not great[.]'"  433 F.3d at 903.

Unlike some of the cases where courts have concluded that the passage of several weeks

was too long to support an inference of causation, this non-selection claim does not really present

a situation where the employer could have taken the challenged action at any time it wished.

Instead, the timing was dictated somewhat by government hiring procedures.  In other words, it is

possible that defendant denied plaintiff the job at the first possible opportunity following her

filing of the discrimination claim -- it just happened to be three months later by virtue of the

normal timing of the hiring process.  Because there was a very close temporal proximity between the initiation of the hiring process for the Operating Committee Chairman, which began on July 31, 2003, and plaintiff's initiation of her Title VII complaint, which occurred eight days later, and because the nature of government hiring procedures often makes it difficult for hiring officials to make prompt decisions, the Court does not believe that plaintiff is foreclosed from making out a *prima facie* case of retaliation on these facts.

To summarize, the Court cannot conclude, as a matter of law, that plaintiff has failed to make out a *prima facie* case of sex discrimination or retaliation with respect to the denial of her application for the position of  Operating Committee Chairman.

### 2.       The evidence of a nondiscriminatory explanation and of pretext

Defendant has come forward with a different nondiscriminatory justification for the non-selection of plaintiff for her old job than it did for the initial reassignment of plaintiff out of that job.  With respect to selecting Mr. Flynn over plaintiff for the post of Operating Committee Chairman, defendant says that the choice was made because, "based on Mr. Borman's observations of Mr. Flynn's performance while in the position of Acting OC Chair as well as his skills and experience, Mr. Borman determined that Mr. Flynn was the best qualified, most superior candidate and would do a superb job."  See Def.'s Mem. in Supp. of Mot. for Summ. J. at 22.

Attacking a qualifications-based explanation for an adverse employment action can be somewhat harder than rebutting other proffered explanations because governing precedent instructs courts to "respect the employer's unfettered discretion to choose among qualified candidates," Fischbach v. D.C. Dept. of Corrections, 86 F.3d 1180, 1183 (D.C. Cir.1996), and

not to "reexamine governmental promotion decisions where it appears the Government was faced with a difficult decision between two qualified candidates, particularly when there is no other evidence that [a forbidden consideration] played a part in the decision," <u>Stewart</u>, 352 F.3d at 430.

Plaintiff here has produced ample unrebutted evidence that she was not only objectively well-qualified for the position (for example, her perfect 100% score in the pre-interview screening) but also that she had excelled in the position for nearly eight years.  Although she wisely does not dispute the fact that Mr. Flynn also was qualified for the job (he scored a 96.5% in the pre-interview screening, fourth among all applicants) and performed well as Acting Chairman, she *does* contend that her experience -- specifically her length of service in the very job she was denied -- and other credentials made her an objectively superior choice.

The Supreme Court recently declined to "define ... precisely what standard should govern pretext claims based on superior qualifications," but it did specifically reject as improper a standard articulated by the Eleventh Circuit that "[p]retext can be established through comparing qualifications only when 'the disparity in qualifications is so apparent as virtually to jump off the page and slap you in the face.'"  <u>Ash v. Tyson Foods, Inc.</u>, 126 S.Ct. 1195, 1197-98 (2006).  In so doing, the Court cited, with some indication of approval, the statement of the D.C. Circuit in <u>Aka</u> that a factfinder may infer pretext if "a reasonable employer would have found the plaintiff to be significantly better qualified for the job."  <u>See id.</u> at 1198 (quoting <u>Aka</u>, 156 F.3d at 1294).  In <u>Aka</u>, the D.C. Circuit explained that

> [i]f a factfinder can conclude that a reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate -- something that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture.

156 F.3d at 1294.  Although the evidence of the difference in qualifications between plaintiff and

Mr. Flynn is not overwhelming, it may be sufficient to support a jury determination that,

objectively speaking, plaintiff was significantly better qualified for the position by virtue of her

many more years of distinguished service in that very job.

Employers, of course, are free to consider *non-objective* factors in employment decisions,

as defendant acknowledges having done here, but the D.C. Circuit has warned that "explanations

that rely heavily on subjective considerations" merit closer scrutiny.  As the court explained in

Aka:

> Particularly in cases where a jury could reasonably find that the plaintiff was otherwise
> significantly better qualified than the successful applicant, an employer's asserted strong
> reliance on subjective feelings about the candidates may mask discrimination. Indeed, we
> observed in Fischbach ... that an employer's heavy use of "highly subjective" criteria, such
> as "interpersonal skills," could support an inference of discrimination.

Id. at 1298.  In a similar vein, the Supreme Court has said that, although "the fact that a court

may think that the employer misjudged the qualifications of the applicants does not in itself

expose him to Title VII liability, ... this may be probative of whether the employer's reasons are

pretexts for discrimination."  Burdine, 450 U.S. at 259.

Here, the Court does not believe that defendant's reliance on Mr. Borman's subjective

observations is sufficient to prevail on a motion for summary judgment where plaintiff has come

forward with some evidence of objectively superior qualifications.  Additionally, as the court of

appeals emphasized in Aka, Title VII plaintiffs who are faced with a qualifications-based

explanation for an adverse employment action need not prevail in a contest of résumés in order to

survive summary judgment:

> A plaintiff attacking a qualifications-based explanation is of course not limited to

comparing his qualifications against those of the successful candidate.  The plaintiff can instead seek to expose other flaws in the employer's explanation.  For example, the plaintiff can attempt to show that the employer's explanation was fabricated after the fact by showing that it contradicts other contemporaneous accounts of the employer's decision.  ... Adequate evidence of this type may suffice to permit a jury to infer that the employer's explanation is incorrect or fabricated, and thus to infer discrimination.

Aka, 156 F.3d at 1295.  Plaintiff, in addition to offering evidence of her own objective qualifications vis-à-vis Mr. Flynn, has put forward evidence suggesting that defendant did not want her to be Operating Committee Chairman for reasons apparently unrelated to Mr. Flynn's qualifications.  Specifically, she offers documentary evidence indicating that, in mid-February 2002 (more than a year before Mr. Flynn was installed as Acting Chairman for the duration of plaintiff's educational leave), plaintiff's supervisors approached her with a suggestion that she accept a detail with another agency (the U.S.-China Economic and Security Review Commission) for as long as one year -- a proposal that she declined.  See Pl.'s Ex. 17.  Moreover, the difference between the rationale initially offered by defendant for reassigning plaintiff and the rationale for not hiring her back into her old position might itself lead a reasonable jury to conclude that something other than Mr. Flynn's qualifications motivated the decision -- and perhaps to infer that the something else was plaintiff's gender.

Given the uncontroverted evidence of plaintiff's stellar performance reviews, her substantial experience, and her score relative to Mr. Flynn on the objective qualifications evaluation -- along with the different rationales offered by defendant for this action as compared with the closely related reassignment action -- the Court concludes that plaintiff has come forward with enough evidence to create a genuine issue of material fact about whether defendant's proffered rationale was the real reason defendant declined to select plaintiff for the

-24-

position.

### 3.       Defendant is not entitled to summary judgment

Once again then, the question for the Court to resolve is whether -- taking into

consideration the strength of the plaintiff's *prima facie* case, the probative value of the proof that

the employer's explanation is false, and any other evidence -- a reasonable jury could conclude

from all of the evidence that the adverse employment decision was made for a prohibited reason

(that is, either because of plaintiff's sex or because she engaged in protected activity).  The Court

repeats its observation that plaintiff does not have a strong inferential case of *sex discrimination*,

but it cannot conclude that the inference is so weak as to warrant summary judgment for

defendant.  Just as plaintiff survives summary judgment on the claim of sex discrimination in

reassignment, so too the Court must permit her discrimination case to go forward to trial with

respect to the non-selection.

Likewise, the evidence supporting a claim of *retaliation* in the non-selection is not

compelling, but a Title VII plaintiff may create an inference of retaliation solely by making out a

*prima facie* case and tendering evidence that might suggest that the employer has offered false

explanations for its actions.  Viewing the record as a whole, the Court cannot conclude that it

would be unreasonable for a jury to draw such an inference here.  Plaintiff has produced evidence

from which a jury might conclude that defendant chose a significantly less qualified individual

for the position of Operating Committee Chairman and thus that defendant's proffered rationale

for denying plaintiff the position is pretextual.  And plaintiff has further shown, under the

circumstances, a close enough temporal proximity to her protected activity that a jury might

properly infer that plaintiff was denied the position in part because she had pursued a sex-

discrimination claim.[5]  Accordingly, the Court will deny defendant's motion for summary

judgment with respect to the claims of sex discrimination and retaliation arising out of plaintiff's

non-selection as Operating Committee Chairman.

## II.      Constructive Discharge

### A.      Constructive Discharge Allegation Is Not an Independent Claim

Plaintiff contends that defendant's decisions to deny her requests for paid medical leave

and to place her on leave without pay -- although not themselves discriminatory or retaliatory

acts[6] -- were abusive and improper.  Therefore, she submits, they constitute "aggravating factors"

that, when combined with the alleged acts of discrimination and reprisal already discussed,

permit the Court to indulge a legal fiction, known as "constructive discharge," whereby a

resignation is treated as an involuntary termination.

Because the allegation of constructive discharge is based on a collection of events that

precipitated plaintiff's resignation -- specifically, the same two events that plaintiff separately

alleges were unlawful under Title VII, plus decisions that plaintiff does not allege was

discriminatory or retaliatory -- the Court does not interpret plaintiff's references to constructive

discharge as pleading an *independent* basis for Title VII liability (i.e., a separate actionable

---

[5] The Court notes, however, that the inference of retaliation is logically undercut to some
extent by the fact that defendant previously had made the decision to reassign plaintiff -- which,
although technically a separate employment action, is very closely related to the subsequent
decision to deny plaintiff her old job -- and the earlier decision *preceded* any protected activity by
plaintiff.  That said, it may be possible to prove to a reasonable jury's satisfaction that the second
decision involved different or additional motives than the first decision.

[6] Plaintiff made clear at the motions hearing that she is not alleging that these decisions
were themselves adverse employment actions that violated Title VII.  See Tr. of April 27, 2006,
Mot. Hearing at 88.  In other words, there is no independent claim by plaintiff that the decisions
were made because of her sex or because of her involvement in protected activity.

adverse action).  Rather, the Court considers the compound allegation to be an assertion

ultimately relating to the scope of plaintiff's potential recovery in the event that she prevails on

the claims of discrimination or retaliation.  See Knabe v. Boury Corp., 114 F.3d 407, 407 n.1 (3d

Cir. 1997) ("[Plaintiff]'s constructive discharge claim, as presented here, is not a separate ground

for relief, but rather would factor into the [recovery] (e.g., backpay) available to [plaintiff] had

she prevailed in proving [her employer]'s liability for sexual harassment."); EEOC v. R.J.

Gallagher Co., 959 F. Supp. 405, 408 (S.D. Tex. 1997) ("A claim of constructive discharge is not

an independent claim for recovery; it is a counter-defense to the employer's defense that the

worker quit."), rev'd on other grounds, 181 F.3d 645 (5th Cir. 1999).[7]  This interpretation of the

constructive-discharge allegation is consistent with the structure of the complaint itself, which

asserts only that the reassignment and the non-selection were employment actions that violated

Title VII.  See Compl. ¶¶ 50, 61, 73.  By contrast, the complaint treats the alleged constructive

discharge as a *consequence* of the discrimination and retaliation (coupled with the "aggravating

factor" of placing plaintiff on leave without pay).  See id. at ¶¶ 51, 62, 74.

On this view, then, granting defendant's request for judgment as a matter of law on the

issue of constructive discharge would have no dispositive effect on any of the Title VII claims

(i.e., it would not affect the liability determination).  But it *would* impose a limitation on certain

elements of recovery.  If a jury were to conclude that plaintiff did not resign voluntarily, but

instead was constructively discharged (and that the discharge was causally connected to an earlier

---

[7] An allegation of constructive discharge arising out of discriminatory employment actions *may*, in proper circumstances, constitute an independent claim for recovery -- such as a claim of breach of contract (if the employee were covered by a contract) or a claim under some statute other than Title VII (such as the federal civil-service laws, see, e.g., 5 U.S.C. § 7701) -- but no such claim is presented in this civil action, which is founded solely on Title VII, see Compl. ¶ 2.

discriminatory or retaliatory action), plaintiff would be entitled to collect lost pay and retirement benefits under Title VII beyond the point at which her employment ended; on the other hand, if a jury were to reach the opposite conclusion, plaintiff's eligibility for back pay and benefits under Title VII would be cut off as of the date of her resignation.  See Jurgens v. EEOC, 903 F.2d 386, 389 (5th Cir. 1990) ("[I]n order for an employee to recover back pay for lost wages beyond the date of his retirement or resignation, the evidence must establish that the employer constructively discharged the employee.") (citing Bourque v. Powell Elec. Mfg. Co., 617 F.2d 61, 65-66 & n.8 (5th Cir. 1980)); Clark v. Marsh, 665 F.2d 1168, 1173-76 (D.C. Cir. 1981) (following Bourque and affirming an award of post-retirement back pay based on evidence supporting a finding of constructive discharge); EEOC v. Massey Yardley Chrysler Plymouth, Inc., 117 F.3d 1244, 1251 (11th Cir. 1997) (stating, in an age-harassment case, that a finding of constructive discharge arising out of discriminatory acts means that "the injured victim is presumptively entitled to back pay from the date of the discriminatory discharge until the date of the judgement, unless the victim obtains or could have obtained substantially equivalent work before that time").

The Court therefore will treat defendant's motion as one for partial summary judgment with respect to plaintiff's entitlement to recover back pay and benefits on a continuing basis.[8] Defendant's motion on this issue raises two points:  (1) that plaintiff failed to exhaust administrative remedies with regard to the constructive-discharge allegation, and (2) that the

---

[8] Even if the complaint could be read to assert constructive discharge as an independent basis for Title VII liability, the resolution of defendant's motion would be no different.  That is because, for the reasons explained below, defendant's actions cannot be deemed a constructive discharge, and so any independent claim of Title VII liability based on the termination of plaintiff's employment would fail because a resignation is not an adverse action taken by the employer (a necessary element of any *prima facie* case of discrimination or retaliation).

evidence would not support a jury finding that plaintiff was constructively discharged.

### B.     Plaintiff Exhausted Administrative Remedies

Title VII requires federal employees to pursue any complaints of discrimination at the administrative level before proceeding to federal court.  See 42 U.S.C. § 2000e-16(c) ("[A]n employee or applicant for employment, if aggrieved by the final disposition of his complaint, or by the failure to take final action on his complaint, may file a civil action as provided in section 2000e-5 of this title[.]").  A civil action, therefore, cannot be sustained if the plaintiff failed to exhaust the administrative remedies provided for by federal regulation.  Moreover, each discrete incident of alleged discrimination or retaliation constitutes a separate actionable event under Title VII.  See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002) (addressing the charge-filing provision of 42 U.S.C. § 2000e-5 and concluding that "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice'").  Defendant asserts in its motion for summary judgment that plaintiff failed to exhaust administrative remedies with respect to the allegation that she was constructively discharged.  The nonexhaustion argument is two-fold:  first, defendant contends that plaintiff failed to raise the constructive-discharge claim as part of the agency's administrative inquiry into plaintiff's discrimination claims and, second, defendant asserts that, even if plaintiff did raise the issue, she did not do so in a timely manner.

The first objection is plainly without merit.  Plaintiff has come forward with undisputed evidence demonstrating that she formally made a request to include a constructive-discharge claim in the agency's investigation on February 11, 2004; that eight days later the agency's Office of Civil Rights accepted that request and treated it as an amendment to the initial complaint; and

that the agency's investigator included some mention of the claim in his report.  See Pl.'s Exs. 13, 14, & 15.  As plaintiff points out, the administrative exhaustion requirement is designed to ensure that the agency had "notice of [plaintiff's] grievance, and a fair opportunity to provide full redress or to attempt an informal accommodation.  Title VII requires no more."  Loe v. Heckler, 768 F.2d 409, 418 (D.C. Cir. 1985).  Plaintiff's efforts at the administrative level with respect to the constructive-discharge aspect of her claim were sufficiently specific to satisfy that notice standard.

Whether that notice was *timely*, however, is a slightly more complex question -- and one that the defendant did not discuss explicitly in its pre-hearing memoranda.  The regulations that govern administrative proceedings under the federal-employment provisions of Title VII are designed to, among other things, promote prompt, informal conciliation between the complainant and the employing agency.  To that end, the regulations impose strict time limits for initiating proceedings.  Noncompliance with administrative time requirements is tantamount to a failure to exhaust administrative remedies.  Defendant contends that plaintiff did not comply with section 1614.105 of the relevant regulations -- requiring a federal employee who believes she has been discriminated against on the basis of race, color, religion, sex, national origin, age, or disability to contact an Equal Employment Opportunity ("EEO") counselor at the agency within forty-five days of the challenged personnel action, see 29 C.F.R. § 1614.105(a)(1) -- because plaintiff's first attempt to raise the constructive-discharge issue at the administrative level did not occur until ninety-nine days after plaintiff tendered her resignation letter.[9]  Absent some justification for

---

[9] Following the hearing on defendant's motion, plaintiff stipulated that she raised the constructive-discharge issue with the agency's Office of Civil Rights on (or not substantially before) February 11, 2004.  The parties further agree that, to the extent plaintiff may have had an

equitable tolling or waiver, noncompliance with this provision ordinarily will bar recovery.

The Court does not necessarily agree that section 1614.105 applies to the allegation of constructive discharge in this complaint because, as observed above, the complaint treats the alleged constructive discharge not as a discrete incident of discrimination but rather as a fact that is relevant to the harm plaintiff suffered as a consequence of other allegedly discriminatory events).  But, even assuming that the provision *does* apply, there nevertheless are multiple reasons why defendant cannot succeed on its argument that the constructive-discharge assertion was untimely.  First and foremost, another regulation provides that a complainant "may amend [an employment-discrimination] complaint *at any time prior to the conclusion of the investigation* to include issues or claims [that are] like or related to those raised in the complaint."  See 29 C.F.R. § 1614.106(d).  When plaintiff sent the letter of February 11, 2004, to the Commerce Department's Office of Civil Rights requesting that the investigation include within its scope the allegation of constructive discharge, see Pl.'s Ex. 13, the agency interpreted it as a request for amendment and accepted it as such, see Pl.'s Ex. 14.[10]  The Court sees no reason to interpret the forty-five-day requirement of section 1614.105 as implicitly limiting the "at any time" language of section 1614.106 so that an amendment would be permitted "at any time prior

---

oral conversation with an investigating officer regarding the claim at some time just prior to February 11, the actual date of that conversation would not materially affect the timeliness aspect of any exhaustion analysis.  The Court, therefore, will treat February 11, 2004, as the operative date for purposes of determining whether the constructive-discharge claim was properly raised at the administrative level.  The Court also will treat November 7, 2003, the date plaintiff submitted her resignation letter, as the effective date of plaintiff's alleged constructive discharge.

[10] Plaintiff says her intent in sending the letter was *not* to amend the complaint to include a new claim, but rather to confirm to the agency that she knew her pre-existing demand for reinstatement as Operating Committee Chairman might alter the appellate jurisdiction over any decision by the agency on her complaint.  See Pl.'s Suppl. Mem. at 4.

to the conclusion of the investigation," *but only if the amendment is made within forty-five days of the matter alleged to be discriminatory*.[11]

Nor does the Court interpret the regulations as demanding that a complaining party, rather than (or prior to) utilizing the amendment procedure of section 1614.106, initiate a separate informal proceeding under section 1614.105 for every subsequent matter that is "like or related to" an ongoing investigation. That is not to say that a complaining party can disregard entirely the time constraints of section 1614.105 for every subsequent claim that she believes is related to an earlier claim. A complaining party takes a substantial risk if, as in this case, she waits more than forty-five days after the event to request amendment of the earlier complaint -- the risk being that the agency will deem the matters to be not sufficiently "like or related to those raised in the complaint." In such a situation, the complaining party may end up being time-barred from pursuing a remedy for the claim pursuant to section 1614.105. But here defendant did not reject the constructive discharge allegation as unrelated to the pending investigation; instead, the agency accepted the proposed amendment. Moreover, the language of another EEO regulation supports the view that a complaining party need not initiate a separate informal proceeding for a

---

[11] There may be some circumstances in which the forty-five-day time limit of 29 C.F.R. § 1614.105 could operate to prevent a federal employee from using the amendment procedure of section 1614.106 -- for example, where the employee seeks to bring into an administrative complaint "like or related" issues or claims based on discrete events that occurred more than forty-five days *before* the plaintiff initiated the administrative proceeding (i.e., claims for which the time for seeking relief had already passed when the agency was first notified of any claim). See Morgan, 536 U.S. at 114-15 (rejecting argument for a "continuing violation" exception to the statutory time limit on discrimination claims). Here, however, the issue that was brought in by amendment arose *after* plaintiff had initiated the administrative proceeding with respect to her "like or related" claim of discrimination in reassignment. Nothing in Morgan, the federal-employment provisions of Title VII, or the relevant regulations suggests that permitting such an amendment is contrary to law.

related claim.  The regulation governing dismissal of claims by the agency provides:

> Prior to a request for a hearing in a case, the agency shall dismiss an entire complaint ...
> [t]hat fails to comply with the applicable time limits contained in §§ 1614.105, 1614.106
> and 1614.204(c) ... or that raises a matter that has not been brought to the attention of a
> Counselor *and* is not like or related to a matter that has been brought to the attention of a
> Counselor.

29 C.F.R. § 1614.107(a) (emphasis supplied).  The clear implication of this provision is that a

complaint will not be dismissed solely because it raises a matter that was not first brought to the

attention of a Counselor, so long as the claim is "like or related to" a matter that *was* timely

brought to the attention of a Counselor (as was the case here).

Even if this interpretation of the regulatory scheme were incorrect, there is an additional,

sufficient reason for rejecting defendant's claim of untimely exhaustion:  waiver.  Defendant has

had multiple opportunities to raise this objection to plaintiff's allegation of constructive discharge

(including at the administrative level), but did not do so until the oral argument before this Court

on the motion for summary judgment.  Indeed, a plausible argument could be made that

defendant should be estopped from asserting untimeliness because the agency agreed to accept

the amendment to the administrative complaint in February of 2004.  In any event, the agency's

unexplained delay in raising this objection counsels strongly in favor of denying it as waived.

See Brown v. Marsh, 777 F.2d 8, 14 (D.C. Cir. 1985) ("[T]he administrative deadlines [of Title

VII] are not jurisdictional.  Rather, they function like a statute of limitations and 'like a statute of

limitations, [are] subject to waiver, estoppel, and equitable tolling.'").  The Court, however, need

not definitively resolve this issue now because, as explained below, it will grant partial summary

judgment to defendant on the constructive-discharge allegation for other reasons.

### C.     The Evidence Does Not Support a Finding of Constructive Discharge

Turning to the merits of plaintiff's allegation of constructive discharge, an order granting partial summary judgment for defendant on this issue is warranted if plaintiff has failed to offer evidence on which a jury could reasonably find that she was constructively discharged when she submitted her resignation.  See Anderson, 477 U.S. at 252 (specifying the standard for granting summary judgment).  The Court concludes, based on its review of all the evidence, that no reasonable jury could make such a finding, and therefore that defendant is entitled to judgment as a matter of law on this issue.

Plaintiff asserts that she was constructively discharged when, after suffering the alleged discriminatory and retaliatory acts discussed above, she was denied requests for accrued medical leave and placed on leave without pay.  A finding of constructive discharge requires evidence that "the employer deliberately made working conditions intolerable and drove the employee [to involuntarily quit]."  Clark, 665 F.2d at 1173 (internal punctuation omitted).  The standard, moreover, is an objective one; that is, "whether a *reasonable* employee would have concluded that the conditions made remaining in the job unbearable" and thus would have felt compelled to resign.  Lindale v. Tokheim Corp., 145 F.3d 953, 955 (7th Cir. 1998).  Applying this objective test, other federal courts have established a relatively high threshold for what a reasonable employee would tolerate.  It includes most adverse actions taken by an employer that cannot reasonably be construed as "career-ending" for the employee.  See Lindale, 145 F.3d at 956 (offering as an example of a career-ending action a denial of a promotion to an employee where the employer maintains an "up or out" policy).  Thus, absent some indication that the employer was trying to drive the employee from the workplace entirely or that the employee "quit just

ahead of the fall of the axe," the law will not permit a resignation to be transformed into a discharge.  Id.

The kinds of situations where courts have upheld constructive-discharge findings tend to involve extreme mistreatment or thinly veiled (or even overt) threats of termination.  For example, the Seventh Circuit, in an opinion authored by Judge Posner in a race-discrimination case, said that "[a] person who is told repeatedly that he is not wanted, has no future, and can't count on ever getting another raise would not be acting unreasonably if he decided that to remain with this employer would necessarily be inconsistent with even a minimal sense of self-respect, and therefore intolerable."  Hunt v. City of Markham, Ill., 219 F.3d 649, 655 (7th Cir. 2000).  By way of contrast, however, courts ordinarily regard as *voluntary* an employee's decision to quit out of concern for her health.  See Spence v. Maryland Cas. Co., 995 F.2d 1147, 1156 (2d Cir. 1993) ("[T]he fact that an employee develops stress-related ill health from the demands of his voluntarily undertaken position or from criticisms of his performance, and as a result determines that health considerations mandate his resignation, does not normally amount to a constructive discharge by the employer.").  And a single instance of workplace "rejection" -- e.g., the denial of a promotion or a lateral transfer -- if not "career-ending," will not constitute a constructive discharge.

Similarly, in the context of federal civil-service termination claims, the Federal Circuit has developed a doctrine for addressing disputes over whether an employee was fired.  This doctrine largely tracks the constructive-discharge standard in that it presumes a resignation or retirement is voluntary unless the former employee produces evidence tending to show that the resignation or retirement was coerced by the employer, such as through the creation of "working

conditions so intolerable for the employee that he or she is driven to involuntarily resign or retire."  See Shoaf v. Dept. of Agriculture, 260 F.3d 1336, 1340-41 (Fed. Cir. 2001).  But the Federal Circuit has emphasized the narrowness of this doctrine:

> It does not apply to a case in which an employee decides to resign or retire because he does not want to accept a new assignment, a transfer, or other measures that the agency is authorized to adopt, even if those measures make continuation in the job so unpleasant for the employee that he feels that he has no realistic option but to leave. ... [T]he fact that an employee is faced with an unpleasant situation or that his choice is limited to two unattractive options does not make the employee's decision any less voluntary.

Staats v. U.S. Postal Serv., 99 F.3d 1120, 1124 (Fed. Cir. 1996).

The D.C. Circuit, moreover, has said that discriminatory or retaliatory acts alone generally are insufficient to give rise to a finding of constructive discharge -- particularly in cases where the discrimination or retaliation involves a discrete adverse employment action rather than pervasive harassment.  See Clark, 665 F.2d at 1173 (endorsing the statement by the Fifth Circuit that "society and the policies underlying Title VII will be best served if, wherever possible, unlawful discrimination is attacked within the context of existing employment relationships") (quoting Bourque, 617 F.2d at 66).  Where discrimination or retaliation contributes to the alleged constructive discharge, as plaintiff asserts happened here, the former employee must demonstrate the existence of "aggravating factors" that made her working conditions objectively intolerable. Id. at 1174.

Here, plaintiff contends that defendant's denial of her medical leave requests and the accompanying decision to place her on leave without pay amount to aggravating factors that, together with her involuntary reassignment and non-selection for the position of Operating Committee Chairman, created not just an unpleasant work environment, but an unbearable one.

For purposes of resolving the motion for partial summary judgment on this issue, the Court will assume, without deciding, that defendant's decisions to deny plaintiff's requests for medical leave and to place plaintiff on leave without pay were unjustified, inconsistent with internal policies, or otherwise improper (though not motivated by gender-based bias or animus based on protected activity). The question then is whether a jury, viewing the evidence in the light most favorable to plaintiff, reasonably could conclude that defendant -- by discriminating or retaliating against plaintiff in two related personnel decisions and then denying plaintiff paid medical leave beyond the nine weeks already granted -- made plaintiff's continued employment utterly intolerable and thus constructively discharged her. The circumstances presented by this case do not support such a conclusion.

The personnel decisions, even if found to be unlawful under Title VII, may have been career-harming, but there has been no evidence offered to show that they were essentially career-*ending*. See Kalinoski Aff. ¶ 23 ("The export policy analyst position to which I was reassigned had ... far less opportunity for professional advancement and exposure, both within the Department of Commerce and the federal government and the private entities which seek authorization to export dual-use controlled goods and technology, and data."). Indeed, plaintiff's own evidence demonstrates that at least one other federal agency was interested in having plaintiff come to work there after she was transferred out of the Operating Committee Chairman position. See Pl.'s Ex. 20 (Letter of September 22, 2003, from Deputy Undersecretary of Defense John A. Shaw to Mr. Borman re: proposed detail assignment for plaintiff). Nor is there any evidence that the adverse actions would be interpreted by a reasonable person as a sign of imminent termination or even as an indication that defendant no longer wanted plaintiff to

continue working at the agency.  Quite the contrary, even though plaintiff may have felt (and perhaps rightly felt) undervalued or discriminated against due to the reassignment and non-selection, all the evidence indicates that defendant wanted plaintiff to remain as an employee. See, e.g., Albanese Dep. at 28-30; Def.'s Ex. 18 (welcome e-mail from Ms. Albanese to plaintiff). In short, the personnel actions are insufficient in and of themselves to support a claim of constructive discharge.

Defendant's further decision to deny plaintiff's requests for medical leave based on her emotional distress -- after having granted plaintiff nine and a half weeks of paid leave on that basis -- also cannot reasonably be interpreted as creating an objectively intolerable condition of employment, even if the decision was contrary to Commerce Department policies or sound medical judgment.  An employer's wrongful decision to dock an employee's pay while the employee is absent from work over a long period -- which is the effect of the denial of paid medical leave here -- simply is not tantamount to firing the employee.  Furthermore, an employee's expectation that her employer will honor promises to grant paid medical leave in certain situations is certainly no greater than her expectation that her employer will not engage in unlawful discrimination or retaliatory practices.  If actions (including tangible employment actions) tending to defeat the latter expectation are generally insufficient to make out a claim of constructive discharge, then actions tending to defeat the former expectation are as well.

Finally, there is no basis for a reasonable jury to conclude that the cumulative effect of defendant's decisions left plaintiff with no realistic alternative to resignation.  Even after plaintiff was placed on leave without pay, she had the option of resuming work in her new position or staying out on leave without pay until such time as she was terminated.  Instead, she resigned.

-38-

That was her prerogative, but she cannot now claim that her decision to leave was a constructive discharge when defendant was still willing to employ her.

Accordingly, the Court will grant defendant's motion for partial summary judgment on the issue of constructive discharge.

## CONCLUSION

For the foregoing reasons, and based upon the entire record, the Court will grant in part and deny in part defendant's motion for summary judgment.  A separate order has been issued herewith.

        /s/ John D. Bates        
        JOHN D. BATES
United States District Judge

Dated:   May 25, 2006   


Copies to:

Robert C. Seldon
ROBERT C. SELDON & ASSOCIATES, PC
1319 F Street, NW, Suite 305
Washington, DC  20004

   *Counsel for plaintiff*


Mercedeh Momeni
OFFICE OF THE U.S. ATTORNEY FOR THE DISTRICT OF COLUMBIA
555 Fourth Street, NW
Washington, DC  20530
Email: mercedeh.momeni@usdoj.gov

   *Counsel for defendant*